1 | Stuart C. Talley (State Bar No. 180374)
2 | **KERSHAW, CUTTER & RATINOFF, LLP**
3 | 401 Watt Avenue
    | Sacramento, California  95864
    | Telephone: (916) 448-9800
4 | Facsimile: (916) 669-4499
    | Email: stalley@kcrlegal.com
5 |
6 | Attorneys for Plaintiffs
7 |
8 | UNITED STATES DISTRICT COURT
9 | NORTHERN DISTRICT OF CALIFORNIA

10 | TIM NGUYEN, as an individual, and
     | CHRIS CLYNE, an individual, on behalf
11 | themselves and all others similarly situated,

Case No.: CV10-2257 SI

**THIRD AMENDED CLASS ACTION COMPLAINT FOR DAMAGES:**

Plaintiffs,

**1. Breach of Express Warranty;**

v.

**2. Violation of Consumer Legal Remedies Act (Civil Code §1750 *et seq*.);**

BMW OF NORTH AMERICA, LLC, a
Delaware Limited Liability Company; and
DOES 1 through 100, inclusive,

**3. Unfair Business Practices (Business Practices Code §17200, *et seq*.);**

Defendants.

**4. Breach of the Implied Covenant of Good Faith & Fair Dealing; and**

**5. Violation Of The Magnuson-Moss Act – Express Warranty**

<u>**JURY TRIAL DEMANDED**</u>

Plaintiffs TIM NGUYEN and CHRIS CLYNE, allege as follows:

## I.

## <u>JURISDICTION AND VENUE</u>

1.      The Court has original jurisdiction over this case as the aggregate amount in controversy for the Class exceeds $5,000,000.  Plaintiffs are residents of the State of California. Defendant is a Limited Liability Partnership organized under the laws of the State of Delaware.

-1-

Defendant's executive office and principal place of business is in New Jersey.  An unincorporated association is, under U.S.C. §1332(d)(10), a citizen of the state where it has its principle place of business and the state under whose laws it is organized.  Diversity, therefore, can be found because, under U.S.C. §1332(d)(2)(A), a member of the class of plaintiffs is a citizen of a state different from any defendant.  No exceptions to jurisdiction under U.S.C. §1332(d) apply.  Accordingly, this Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(d) also known as the Class Action Fairness Act.

2.      Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(a)(1) because Plaintiff, Nguyen, resides in this judicial district.  Venue is also proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

3.      This Court has jurisdiction over the Defendant identified herein because it is an individual, association, or corporation that is either authorized to conduct or, in fact, does conduct substantial business in this district.

4.      Venue is proper in this district because Defendant does business in the State of California, they do not list a principal place of business in California with the California Secretary of State, and their principle place of business is in New Jersey.

## II.

## INTRADISTRICT ASSIGNMENT

5.      Pursuant to Local Rule 3-5(b), assignment to the San Francisco Division is proper because Plaintiff, Tim Nguyen, resides in this division and a substantial part of the events or omissions giving rise to the claims occurred in this division.

## III.

## PARTIES

6.      Plaintiff TIM NGUYEN is, and at all relevant times was, an individual residing in the Milpitas, California.

7.      Plaintiff CHRIS CLYNE is, and at all relevant times was, an individual residing in the Los Angeles, California.

THIRD AMENDED COMPLAINT FOR DAMAGES

8.      Defendant BMW NORTH AMERICA, LLC ("BMW" or "Defendant") is, and at all relevant times herein was, a corporation existing under the laws of the State of Delaware with its principal place of business in New Jersey.  BMW is authorized to do business and is doing business in the State of California.

**IV.**

**FACTUAL ALLEGATIONS**

9.      This class action lawsuit is brought on behalf of individual consumers who purchased or leased various models of BMW vehicles that were defectively designed and/or manufactured.  The defects are inherent in all of the subject vehicles and render the vehicles unsafe for driving.  As a result, the value of the subject vehicles has been significantly impacted.

10.     Specifically, the vehicles that are the subject of this action include all BMW 2007-2010 125i, 335i, 335xi, 335d, 535i, 535xi, X5 xDrive 35d, X6 xDrive 35i, and Z4 S Drive 35i models equipped with an N54 3.0 liter twin turbo inline-6 engine.  All of these vehicles were manufactured, marketed, sold and leased by BMW through its official dealers throughout the State of California.

**A.      BMW's Advertising**

11.     In 2006, BMW announced with much fanfare the development of its new N54 engine.  BMW touted the new engine as incorporating state of the art technology that included "twin" turbo charges and a new type of fuel injection system.  BMW represented to the public that this new technology would eliminate "turbo lag," a common problem in turbocharged vehicles, and that its new state of the art fuel injection system greatly increased the performance and fuel efficiency of the vehicles.

12.     Specifically BMW's  uniform advertising that was presented to consumers in various formats stated:

"By combining twin turbochargers with BMW's direct fuel injection system and advanced piezo injector technology, we achieved the benefits of turbocharging without the drawbacks, namely poor fuel efficiency and turbo lag.  In fact, we eliminated turbo lag altogether."

Additionally, through window stickers, brochures and other marketing materials, BMW provided specific performance data about the subject vehicles.  This data provided information about the expected horse power of the N54 engine as well as the expected gas mileage that could be achieved through normal driving on highways and through cities.   The defendant also promised that its vehicles were safe, reliable, and would retain their value.

13.     For example, when a prospective purchaser expresses interest in a BMW vehicle, BMW dealers are instructed to hand out brochures and other promotional materials that are designed and drafted by defendant.  Attached hereto as Exhibit 1 is a promotional brochure received by plaintiff, Tim Nguyen.  In this brochure, defendant represented to Mr. Nguyen and other members of the class that:

- "Designed by BMW for lasting pleasure, peace of mind – and value. . . . At BMW, outstanding value is nothing new: year after year, BMW has posted among the highest resale values in its class.  Automotive Lease Guide (ALG) awarded BMW its 'Residual Value Award' in 2004, 2005 and 2006 for the highest predicted retained value of any luxury brand.  And according to Kelley Blue Book, BMWs for model years 2005 and 2006 are projected to retain the most value over the next five years, as opposed to all other brands."

- "BMW introduces a revolution in power.  The all-new 3 Series Coupe for 2007."

- "Only BMW designers and engineers steeped in motorsport could have produced the all-new 3 Series Coupe. . . Two new inline six-cylinder engines achieve faster acceleration and greater torque – but with a reduced thirst for fuel. . . . With its dynamic performance, elegant appointments and outstanding passenger protection, the all-new BMW 3 Series Coupe continues to firmly clinch the title of the world's quintessential Sports Coupe."

- "It will take you from 0-60 in 5.3 seconds.  It will thrill you even faster."

14.     Additionally, on page 28 of the brochure, the defendant makes very specific and detailed representations about the N-54 engine, its performance, and its so called advanced technology.  Here the defendant represents:

"BMW creates two revolutions in power.  Engines are our passion.  That's why a BMW engine does not just deliver power and performance, but it also does so very smoothly and efficiently. . .

Beneath the long hoods of the 3 Series Coupes lie two of the world's newest, most sophisticated inline six-cylinder engines – and the new power

-4-

1  plant in the 335i is a first in a production BMW; the revolutionary twin
2  turbo.  Generating 300 horsepower and 300 lb-ft of torque, this advanced six
   accelerates with a force that throws you back in your seat and doesn't stop
3  until redline, reaching 60 mph in 5.3 seconds. Turbo lag is a thing of the
   past, thanks to Double-VANOS 'steplessly' variable valve timing, Direct
4  Fuel Injection, and BMW's inspired use of two turbochargers, each
   supplying 3 cylinders with compressed air.  BMW engineers have overcome
5  the traditionally poor gas mileage of turbo charging.  By using Direct Fuel
   Injection – a high-precision fuel injection system – every ounce of fuel is
6  maximized, making the twin turbo engine more efficient. . . .All you
   experience is strong, quick acceleration on demand."
7

8  At the top of this same page, BMW boasts "outstanding responsiveness" and includes a dyno

9  graph that it describes as a "portrait of an engineering masterpiece."  This dyno graph shows that

10 the subject vehicles can achieve maximum power at relatively low rpms.  Specifically, the dyno

11 graph shows  "300 lb-ft of torque at 1400 rpm, which continues without fading through to the

12 5000 rpm range.  With such a broad range of powerful torque, you can enjoy smooth, robust

13 acceleration in any gear, at any speed."

14      15.      In addition to promoting its vehicles through brochures handed to consumers, the

15 defendant also published numerous television and magazine advertisements.  For example, in the

16 August 2007 edition of BestLife magazine, the defendant placed a full page advertisement

17 promoting a vehicle that is equipped with the defective N54 engine:

18      "[D]rop your foot on the accelerator, instantly, you'll understand what is
        means to be utterly and blissfully free.  Every inch of the all-new 3 Series
19      Convertible has been painstakingly designed to elevate driving to a whole
        new liberating level.  With a direct-injected, twin-turbo inline six, our most
20      dynamic 3 Series powerhouse to date and a light but spectacularly rigid
        body, its an enthralling experience top to bottom.  And Vice versa."
21      (Exhibit 2.)

22      16.      In the April 2008 edition of Dwell magazine, the defendant placed a full page

23 advertisement promoting a vehicle that is equipped with the defective N54 engine:

24      "Pure Power.  Whether you are behind the wheel of the all-new 128 or 135i,
        you will enjoy the power BMW is known for.  With as much as 200 available
25      horsepower and 0-60 in 5.1 seconds driving the all-new 1 will give your
        goosebumps goosebumps."  (Exhibit 3.)
26

27      17.      In the July 2007 edition of Vibe magazine, the defendant placed a full page

28 advertisement promoting a vehicle that is equipped with the defective N54 engine.  The

advertisement states:

> "Introducing the 2008 BWM 5 Series. . . . Starting with a 360-hp V8 Valvetronic engine that increases responsiveness and performance with new lightweight material that improve handling."  (Exhibit 4.)

18.    In a 2008 edition of *Motor Trend* magazine, the defendant placed a full page advertisement promoting a vehicle that is equipped with the defective N54 engine: The advertisement states:

> "With each 3 Series model, new innovations are added as long as they don't get in the way of the drive.  After all, that's what the 3 Series is known for.  Whether you r behind the wheel of the 230 –hp 328i or the 300-hp 335i with its direct-injection turbo engine and impressive 0-60 time of 5.3 seconds, the new 3 Series is sure to send our competitors scrambling yet again. . . . .
>
> Compared to the 1990 3 Series, the new 328i is 5% larger, 27% quicker, has 37% more horsepower and consumers 36% less fuel."
>
> "Introducing the most powerful BMW 3 Series Coup ever.  It's a balance of breathtaking design on the outside and endorphin-producing technology on the inside.  The all-new Coupe's 300-hp inline six cylinder, twin-turbo engine is more powerful yet more fuel-efficient. . . . Its advanced automatic transmission shifts in milliseconds for smoother ride.  . . . As an independent company, we make sure great ideas live on to become the ultimate driving machine."  (Exhibit 5.)

19.    The defendant's advertising not only promoted the performance of its new N-54 engine but it also heavily promoted the safety of its vehicles in general.  For example, in the March 2008 edition of *Cincinnati* magazine, the defendant placed a full page advertisement promoting the safety of its vehicles as follows:

> "What if all the effort BMW puts into performance went into safety?  It already does.  At BMW safety takes a backseat to nothing."  (Exhibit 6.)

20.    In the April 2008 edition of *Dwell* magazine, the defendant placed a full page advertisement promoting the safety of its vehicles as follows:

> "Pure Safety.  The 1 Series Condensed Yes.  Missing  anything? No. Not the BMW performance one expects.  Not the BMW safety features. . . . Pure Peace of Mind.  [The 1 Series] has been reduced, but is missing nothing . . ."  (Exhibit 3.)

In a 2008 edition of *Motor Trend* magazine, the defendant boasted:

> "Playing It Safe. When we're not counting in horsepower, we're counting in milliseconds. In addition to six standard airbags, the new 3 Series is equipped with new crash-active headrests, which shift forward within 20 milliseconds, softly bolstering the head after impacting the airbag. *And a precise network of suspension, engine management, brakes and tires works to avoid accidents in the first place."* (Exhibit 5.)

21. Both plaintiffs observed the defendant's advertisements in magazines and television and both received the brochures distributed by defendant's dealers. Based on these advertisements, both plaintiffs believed that the subject vehicles were "high performance" and would meet BMW's advertised standards for horsepower, torque, fuel efficiency, and acceleration. Plaintiffs also believed that their vehicles would be manufactured to the highest safety standards and would be free from material defects. Finally, both plaintiffs believed that their "ultimate driving machines" would retain their value and, in fact, outperform other similar vehicles with respect to depreciation.

22. Unbeknownst to plaintiffs and the public, the defendants advertising was false and misleading. Specifically, the "Ultimate Driving Machines" promoted by the defendant contained several serious design flaws that render the subject vehicles unsafe. Additionally, these flaws cause a serious reduction in the vehicle's performance such that they fail to meet BMW's advertised performance standards. The ultimate result of these defects is that plaintiffs and all members of the class did not receive the benefit of their bargain and/or overpaid for their vehicles, made lease payments that were too high and/or sold or will sell their vehicles for less than they should. Specifically, there are two separate design and/or manufacturing defects that are the subject of this case.

**B.     Defective Waste Gates**

23. BMW advertised its N54 engine as having eliminated turbo lag. Turbo lag is a common result of adding turbochargers to an engine. Turbochargers use forced induction (air forced into the intake manifold) to spin the turbines of the turbochargers. Turbo lag encompasses the time that it takes for the turbines to begin spinning until the time that it takes for that power to

transfer to the engine. It is typically about a second.

24. In addition to telling consumers that their engines had eliminated turbo lag, the defendant also provided consumers with a dyno graph showing exactly how much torque and horsepower the engine generates at various rpms. This graph shows maximum torque at relatively low rpms with smooth acceleration throughout. In other words, the graph demonstrates a vehicle that does not exhibit turbo lag.

25. The engine design BMW used for the N54 takes two fairly small turbochargers, each powering 3 cylinders. Each of these turbochargers connected to "waste gates" that regulate their performance. However, the waste gates that BMW used were defective in either their manufacturing and/or design. The waste gates do not seat properly, thus resulting in an improper seal. This creates a loud noise when the waste gates flutter against the seal and creates excessive turbo lag, delay in throttle response, and lack of acceleration.

26. After BMW discovered this design flaw, it began replacing waste gates on vehicles in certain vehicle identification number ("VIN") ranges that exhibited the problem. Those vehicles outside of the said VIN range were never mechanically repaired. However, at some point in time BMW decided to stop replacing waste gates and, instead, began a secret campaign to alter the vehicles' software in order to manipulate the operation of the vehicles' waste gates. Specifically, the software at issue is designed to always keep the waste gates open so that that it is impossible for the vehicle's owner to hear the distinctive loud engine noise that occurs when the waste gates fail to create a proper seal. However, when the waste gates are open exhaust leaks through the waste gates, which diminishes the performance of the engine significantly. With the new software the engines experience a significant reduction in horsepower, torque, and a loss of fuel efficiency. Additionally, the vehicle actually experiences more turbo-lag than would occur with a standard BMW engine.

27. BMW's efforts to conceal the defect by automatically altering the vehicles' software was done secretly and without the knowledge or consent of the vehicles' owners. Many owners report that they brought their vehicles in for routine maintenance or some minor problem and when their cars were returned they noticed a discernable reduction in performance and

greatly increased incidences of turbo lag.  It was only later that the consumer discovered that the software for the vehicle had been altered and that this was cause of the vehicle's decrease in performance.

28.    This masking effect of the software alterations reduced the performance of the vehicles to the extent that BMW's advertisements, representations, and claimed performance capabilities were clearly unachievable and blatantly false.

29.    BMW used the software alterations to deceive its customers and avoid the cost and labor of properly resolving the hardware problems, which required actual engine work and/or part replacements that were covered under BMW's warranty.  BMW chose instead to disguise the underlying defective hardware and knowingly create new problems that included the potentially dangerous acceleration delay, a/k/a "turbo lag", in the subject vehicles.  During service visits, BMW intentionally misled customers to believe that their reported problems were imagined or non-existent, and that their vehicles were performing to the levels cited in BMW's ads and new vehicle brochures.  BMW continued to intentionally lie to those customers who repeatedly complained by telling them that they were mistaken about the problems.

30.    The appropriate resolution for BMW was to replace the problematic turbochargers or waste gate mechanisms, rather than downgrade the vehicles' software.

31.    The increased incidence of turbo lag and the decrease in performance creates serious safety risks.  Specifically, the National Highway Transportation Safety Administration has received several reports of individuals who have reported a lack acceleration when attempting to pass other vehicles or when merging into traffic.  Plaintiffs are informed and believe that these incidences were caused by a failure of the waste gates and/or software alterations that were done by BMW to hide problems with the waste gates.

32.    Owners of the affected vehicles have been forced to live with potentially dangerous problems and vehicles that do not perform as advertised.  In many cases, customers' only recourse was to independently seek out aftermarket companies to obtain independent software flash updates to eliminate the turbo lag problems, at significant out-of-pocket expense. And, the aftermarket fixes were not permanent, because when the vehicles were returned for

service to BMW, BMW often automatically changed the software, without the consent of the owners. BMW overwrote the aftermarket flash updates with their "down-grade" version. Even with the aftermarket update that resolved many of the problems, often the ultimate result was performance that was noticeably less than advertised by BMW. In some instances, BMW refused to perform warranty work on these vehicles with aftermarket fixes, leaving the owners or lessees with out-of-pocket expenses to cover repairs, which should have been covered by the BMW warranty.

33.     BMW eventually changed problematic hardware and/or introduced new engine control units in its newly manufactured vehicles, but customers of the vehicles in question remain saddled with vehicles that possess underlying defects, exhibit turbo lag and other potentially dangerous problems, and do not possess the performance characteristics that were advertised, bargained and paid for.

**C.     Defective Fuel Pumps**

34.     The second defect associated with the N54 engine relates to its newly designed fuel injection system. Specifically, BMW's new fuel injection system incorporated as supposedly "state of the art" fuel pump that is responsible for injecting fuel into the pistons that run the engine. In order to increase fuel efficiency and performance, the fuel pumps on the N54 engine are highly pressurized. However, the high-pressure fuel pump (HPFP) that BMW used in its N54 engine has design and/or manufacturing defects that results in an extremely high failure rate.

35.     Specifically, hundreds of owners have reported experiencing HPFP failures shortly after purchasing their vehicles; some within 1,000 miles of vehicle ownership. When the HPFP fails, the vehicle goes into "limp mode," which is a highly reduced power mode. If a HPFP fails in certain traffic conditions, the driver could be put in very dangerous situations. For example, many individuals have reported barely avoiding an accident when their HPFP failed while they were traveling on the highway at high speeds. Due to the prevalence of these problems, there is little doubt that the HPFP defect essentially make all of the subject vehicles unsafe to drive.

36.     For those who have experienced HPFP failures, BMW's practice has been to either change the software in the vehicle or replace the fuel pumps with another. However, the

"software" fix does nothing to actually alleviate the problem. The fuel pump is still prone to fail. Additionally, when BMW replaces the fuel pump, this also fails to remediate the problem. The "replacement fuel pumps" are no different than the original pumps and have the same inherent design and/or manufacturing defect that caused the initial failure. As a result, hundreds of BMW owners report having multiple fuel pump failures that have involved multiple "software fixes" and the replacement of the pump. These consumers' vehicles spend weeks or months in the shop and have become completely unreliable. In fact, some consumers have reported actually purchasing an additional vehicle for long distance trips due to the inherent unreliability of these cars.

37.   The numerous problems with the defendant's HPFPs have become the subject of significant attention on the Internet where hundreds of consumers have reported problems with these pumps. In fact, the HPFP failure are so prevalent that they have become the subject of an on-line petition campaign wherein disgruntled BMW owners can voice their concerns about these problems and the affects that they are having on both the vehicles' reliability and resale value. As of the date of this complaint, 760 BMW owners signed the on-line petition. (See Exhibit 7.)

38.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to notify consumers of the defective fuel pump contained in their subject vehicles, and have failed to take necessary steps to ensure the safety of the public. Further, BMW knowingly sold, and continues to sell, vehicles containing the defective fuel pump, while actively and improperly concealing and suppressing information about the defective fuel pump, as well as its potential safety consequences, from the consuming public and governmental agencies.

39.   Plaintiff is further informed and believes, and thereon alleges, that Defendants are aware that the fuel pumps installed in all of the subject vehicles are defective and pose an unreasonable safety risk to the consuming public due to the jerking forward and/or backward and the sudden loss of power while being driven.

40.   Plaintiff is further informed and believes, and thereon alleges, that Defendants systematically concealed from members of the consuming public, as well from the National Health Traffic Safety Administration ("NHTSA"), material information regarding the scope and

-11-

nature of the defective fuel pump, the safety risk created by the defective fuel pump, and the resulting accidents and/or injuries caused by the defective fuel pump. Plaintiff is informed and believes, and thereon alleges, that Defendants actively concealed and suppressed information concerning the defective fuel pump, in order to maximize its profits and its market share, while avoiding a costly recall and/or the cost of replacing the fuel pump in all of the affected vehicles.

41. As a direct and proximate result of the Defendants' systematic concealment of the defective fuel pump from the public, plaintiffs and members of the Class had no opportunity to consider the safety risk when they purchased their vehicles. Plaintiffs and the Class were unaware that the vehicle posed a grave risk to their safety, as well as those in the vicinity of the affected vehicles when the fuel pump fails to engage properly, as specified herein.

42. The defect in the fuel pump is a defect of design and/or manufacture which relates to and is present in all BMW vehicles including plaintiffs', and is not merely related to a few or some BMW vehicles. The defect, and the resulting dangerous condition, appears suddenly and without warning.

43. In addition to posing the significant safety risk as identified above, the defect significantly diminished the market value of the plaintiffs' vehicles and has rendered them unsellable as to potential buyers who become aware of the vehicles' unsafe condition. Plaintiffs are informed and believe that no reasonable consumer, with full knowledge of the defects reflected herein, would ever be willing to purchase the subject vehicles or would only do so at a significant discount.

**D.    Allegations Specific to Plaintiff**

44. On or about December 2006, Plaintiff, Nguyen, purchased a new 2007 BMW 335i from a BMW dealership. Prior to purchasing his vehicle, Mr. Nguyen had observed various BMW advertisements and had been provided brochures at the dealership describing his vehicle. Based on these advertisements, Mr. Nguyen believed that the car he was purchasing was a "high performance" vehicle that would meet or exceed the advertised specs for horsepower, torque, and fuel efficiency. He also believed the vehicle was safe, reliable, and free from defects. At the time of purchase, Mr. Nguyen was given the standard manufacturer's warranty, as set forth in the

-12-

warranty manual provided to Plaintiff.

45.     Shortly after purchasing his vehicle, plaintiff's BMW would not start.  He took the vehicle into the dealership and was advised that there was nothing wrong with the car.

46.     Plaintiff is informed and believes that the problems with his vehicle were the result of a defective fuel pump that is prone to failure well before the expected useful life of the pump. Plaintiff alleges that despite bringing his vehicle in for repair, the defendant refused to replace the fuel pump that it knew was defective.

47.     Plaintiff is also informed and believes that when he took his vehicle in for repair, BMW secretly altered the software in his vehicle to prevent the waste gate defects from manifesting and that as a result the performance of his vehicle has been diminished.

48.     Mr. Nguyen's belief in this regard was confirmed when he had his vehicle examined by a certified BMW mechanic to measure the vehicle's torque and horsepower.  The results of this testing showed that plaintiff's vehicle could not achieve full torque until the engine exceeded 1900 rpms.  This directly contradicts BMW's advertising and brochures claiming that full torque could be achieved at 1400 rpms.   The failure to achieve full torque until 1900 rpms is indicative of turbo lag; a condition that defendant repeatedly promised to eliminate in its advertising and other materials.

49.     Based on the foregoing, Mr. Nguyen believes and alleges that when he purchased his vehicle he failed to receive the benefit of his bargain and paid more for the vehicle than  the vehicle was worth.  Mr. Nguyen further alleges that the resale value of his vehicle has been significantly diminished as a result of the defendant's conduct as alleged in this complaint.

50.     On or about August 8, 2009, plaintiff Chris Clyne purchased a 2009 BMW 335i coupe for a total price of $50,494 from a BMW dealership.   Prior to purchasing his vehicle, Mr. Clyne had observed various BMW advertisements and had been provided a brochure at the dealership describing his vehicle.  Based on these advertisements, Mr. Clyne believed that the car he was purchasing was a "high performance" vehicle that would meet or exceed the advertised specs for horsepower, torque, and fuel efficiency.  He also believed the vehicle was safe, reliable, and free from defects.  At the time of purchase, Mr. Clyne was given the standard manufacturer's

-13-

warranty, as set forth in the warranty manual provided to Plaintiff.

51.     Approximately one month after purchasing his $50,000 vehicle, the "Service Engine Soon" light began illuminating intermediately in his vehicle.  Because the vehicle was not experiencing any performance issues, Mr. Clyne assumed that there was something wrong with the light.

52.     Beginning in February and March 2009, Mr. Clyne's vehicle began exhibiting long cranks when he attempted to start the vehicle.  This would typically occur in the morning and the "Check Engine" warning light would illuminate.  When this would occur the vehicle would run very rough as if it was losing power.  However, because the problems were intermittent, Mr. Clyne did not seek repairs.

53.     On August 7, 2010 (less than a year after purchasing his vehicle), Mr. Clyne was traveling in his vehicle when it began to lose power.  Within a few miles of his home the vehicle "Check Engine" light illuminated and the vehicle went into "limp mode."   The next day the vehicle started with no problems.

54.     On September 14, 2010, Mr. Clyne took his vehicle in for repair and reported the problems he had been experiencing over the past year.  The next morning Mr. Clyne retrieved his car and was told that the vehicle just needed a "software update."  Other than updating the software no other repairs were made to the vehicle.  However, after the software was "updated," Mr. Clyne noticed that the vehicle did not perform as it did previously and appeared to have diminished horsepower, acceleration, and torque.  Although the difference was subtle, it was noticeable.

55.     The very day after retrieving his vehicle from the BMW dealership, Mr. Clyne was merging on to the 405 Freeway when his car suddenly and unexpectedly experienced a significant loss in the ability to accelerate.  Although Mr. Clyne was able to eventually merge into traffic without incident, the condition caused a serious safety hazard as the vehicle could not achieve maximum acceleration.  The next day, Mr. Clyne's vehicle appeared to be operating normally.

56.     Over the next month, Mr. Clyne's vehicle experience intermittent loss of power, long cranks, and the illumination of the check engine light.  On October 12, 2010 Mr. Clyne was

traveling on the 405 freeway when his car, again, went into limp mode.  After avoiding a potential collision, Mr. Clyne pulled his car off the freeway and turned off the engine.  The engine would not restart.  After several attempts to restart the car, it eventually started and drove normally.

57.     On October 13, 2010 Mr. Clyne brought his car in for repair.  The vehicle was diagnosed with a failed fuel pump which was replaced.  However, Mr. Clyne is informed and believes that the new fuel pump installed in his vehicle is no different than the previous fuel pump and is prone to failure.  This is confirmed by the numerous reports of individuals who have experienced multiple fuel pump failures after the defendant supposedly "repaired" their vehicles.

58.     Based on the foregoing, Mr. Clyne believes and alleges that when he purchased his vehicle he failed to receive the benefit of his bargain and/or paid more for the vehicle than the vehicle was worth.  Mr. Clyne further alleges that the resale value of his vehicle has been significantly diminished as a result of the defendant's conduct as alleged in this complaint.

**E.      The Defendant's Illusory Recall**

59.     This case was originally filed on May 25, 2010.  Shortly thereafter, the defendant filed a motion to dismiss the plaintiff's complaint.

60.     On October 25, 2010, ABC News aired an investigatory report on BMW's N54 high-pressure fuel pump defect, resulting from a 30-day investigation.  The story contained an interview with BMWNA's Vice President of Engineering Tom Bologa.  When asked about the issue, Bologna stated, "[The investigation] caused us to decide to take action sooner, rather than later."  What Bologa did not tell ABC News was that BMWNA was well aware of the issue for nearly four years and did not replace the defective part in the affected vehicles with a properly working fuel pump.  Instead, BMWNA replaced the defective fuel pump on some affected vehicles that experienced fuel pump failures **with new or remanufactured defective fuel pumps.**  Refusal to take appropriate action may have saved BMWNA money, but it did nothing to improve safety concerns for owners and lessees who were driving the affected vehicles.  When Bologa was asked to characterize the failure, he stated, "When that high-pressure pump on the engine fails, the vehicle goes into what we call a safe mode, which means that you have power

-15-

steering, power brakes but you don't have as much power and that can be startling for some people." A startling situation while operating a 4000+ pound machine in speeds exceeding 60 mph is not by any means "safe." When asked why BMWNA did not recall affected vehicles for a replacement, Baloga said, "We don't want to alarm people …"

61.     Just hours after the ABC News story aired, BMW NA issued a press release describing what it referred to as "BMW Voluntary Emissions Recall Campaign N54 High-Pressure Fuel Pump" (hereinafter referred to as "recall"). (*See* Press Release attached hereto as Exhibit 8.) The press release clearly states, "[n]o injuries have been reported" from individuals who experienced fuel pump failures.

62.     This press release was false and misleading since there had, in fact, been reports of an injury caused by a defective fuel pump. Specifically, NHTSA received the following report of an incident that occurred in September 2007:

"ENTERING A FREEWAY ON RAMP DURING A TURN, THE CAR'S FUEL SYSTEM FAILED AND CAUSED THE CAR TO 'SHUTTER' (SAME FEELING AS SOMEONE WHO DOES NOT KNOW HOW TO DRIVE A STICK SHIFT). THIS CAUSED THE CAR TO LOSE CONTROL AND FLIP OVER AFTER HITTING A DITCH. THE CAR HAS ALREADY HAD TWO FUEL PUMPS REPLACED AND BMW KNOWS ABOUT THIS PROBLEM. SO FAR, BMW DOES NOT WANT TO TAKE RESPONSIBILITY FOR THEIR INABILITY TO FIX THIS KNOWN 335I PROBLEM. THERE ARE ALREADY 11 COMPLAINTS (NOT INCLUDING THIS ONE) REGARDING THE ISSUE ON THIS WEBSITE." (Exhibit 9.)

63.     Additionally, the press release is false and misleading since it greatly minimizes the safety aspect of the defective high-pressure fuel pumps. BMW claims that it notified NHTSA of the recall—the same agency that collects and reports data on vehicle issues, problems, and defects.

64.     It was not until December 2010, that BMW NA sent letters to owners and lessees of affected vehicles to notify them of the high-pressure fuel pump recall. (*See* recall notice letter attached hereto as Exhibit 10.) Although the high-pressure fuel pumps are defective, the recall

notice states that BMW NA will not be replacing the fuel pumps in all of the effected vehicles. Rather, most of the recalled vehicles will receive a "software update." The service bulletin SI B13 13 10 is the service bulletin used to instruct service technicians on how to perform the recall. (*See* recall service bulletin attached hereto as Exhibit 11.)

65.     The plaintiffs are informed and believe that the proposed "software fix" does nothing to actually repair an admittedly mechanical defect in the high-pressure fuel pump. Updating the software only masks problems that may be a precursor to a fuel pump failure. Also concerning, is the instruction that BMW NA gives to service technicians not replace high-pressure fuel pumps unless a fault code is stored in the vehicle's computer system. In other words, the defective fuel pumps are not being recalled, but only being evaluated as to whether or not they should be replaced based on their history of exhibiting symptoms of failure.

66.     Additionally even if the defendant was replacing all of the defective fuel pumps, there is no indication that the replacement fuel pumps are any different than those that are being replaced. As indicated above, many class members have reported experiencing multiple fuel pump failures after replacement. Unless the replacement fuel pumps have a fundamentally different design and/or are subject to different manufacturing guidelines, there is no guarantee that the pumps will not continue to fail at an alarming high rate.

67.     In essence, the defendant's recall does little if anything to increase safety for owners and lessees. The defendant's recall is nothing more than an illusory fix put in place to counteract the ABC News report and create a false sense of security and safety for BMW owners and lessees. In fact, plaintiffs are informed and believe that the proposed "software fix" that will occur in most recalled vehicles could actually make the vehicles less safe since the proposed "fix" would only mask symptoms that typically develop shortly before a catastrophic fuel pump failure (ie. shuttering, long cranks etc.). As such it would be futile for any consumer to actually submit their car for repair since the recall fails to actually repair the vehicles and may actually make them less safe.

**F.     The Affect on Resale Value**

68.     Despite the defendants express representations that the subject vehicles would

-17-

likely retain their value at a rate higher than competing vehicles and that the vehicles are "reliable," this has simply not occurred. As a result of the numerous problems with the subject vehicles as described herein and the extremely high rate of fuel pump failures, the value of the subject vehicles has been significantly diminished. On the Internet and in other media outlets, hundreds of people have reported the problems they have experienced with their vehicles and the fact that they are unsafe and unreliable. There is little doubt that these reports have serious diminished the resale value of the vehicles.

69.     Additionally, the effect on the subject vehicle's value and its reliability has been confirmed through independent research conducted by various entities including *Consumer Reports*. In its January 2011 edition, *Consumer Reports* reported that:

"BMW had a bad year, with five of its 11 models scoring below average [with respect to reliability]. While the BMW M3 topped the sportscar category, the 1, 2, and 5-Series models with the 3.0 liter turbocharged engine had high problem rates related to the fuel system, among other gripes."

70.     As a result of these problems, BMW vehicles for years 2007 through 2010 were ranked in the bottom five for reliability when compared to all other vehicle brands. With respect to individual rankings, many of the vehicles that are the subject of this litigation were ranked last or second to last for reliability when compared to all other cars in their class. (See ie. the BMW 335(RWD), BMW 135i, BMW X6) A true and correct copy of the Consumer Reports rankings are attached hereto as Exhibit 12.

**V.**

**TOLLING OF STATUTE OF LIMITATIONS**

71.     On or about July 22, 2009 a class action lawsuit was filed in *Cho v. BMW of North America, LLC* wherein the plaintiff sought damages and other relief for purchasers of BMWs that were manufactured with defective and unsafe fuel pumps. That action was removed to Federal Court on or about August 24, 2009 and was given Case Number CV 09 3880. The plaintiff was a member of the class that the representative plaintiff in *Cho* sought to certify.

72.     For some unknown reason, the *Cho* action was dismissed on October 26, 2009

-18-

prior to any determination as to whether a class should be certified.  By operation of this class action, the statute of limitations with respect to the Class' claims is tolled during the time period that the *Cho* action was pending in this court.

**VI.**

**CLASS ACTION ALLEGATIONS**

73.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of himself and the following Class:

> All current and former owners and lessees of 2007-2010 BMW 335i, 335xi, 535i,
> and 535xi, X5d, X6, and Z4 3.5 sDrive models equipped with N54 3.0 liter twin
> turbo inline-6 engines designed, manufactured, marketed, sold and leased by the
> defendants who reside in the state of California (the "Class").

Excluded from the Class are Defendant, as well as Defendant's employees, affiliates, officers, and directors, including franchised dealers, any individuals who experienced physical injuries as a result of the defects at issue in this litigation and the Judge to whom this case is ultimately assigned.  Plaintiff reserves the right to amend the definition of the Class if discovery and/or further investigation reveals that the Class should be expanded or otherwise modified.

74.     <u>Numerosity / Luminosity / Impracticality of Joinder</u>:  The members of the Class are so numerous that joinder of all members would be impractical.  Plaintiffs reasonably estimate that there are thousands of Class members who purchased the relevant vehicles.  The members of the Class are easily and readily identifiable from information and records in Defendant's possession, control, or custody.

75.     <u>Commonality and Predominance</u>:  There is a well-defined community of interest and common questions of law and fact that predominate over any questions affecting the individual members of the Class.  These common legal and factual questions, which exist without regard to the individual circumstances of any Class member, include, but are not limited to, the following:

> a.   Whether the turbo system, turbochargers, high-pressure fuel pumps, or
>      waste gate mechanisms in the relevant vehicles are defective;

b. Whether Defendant omitted, misrepresented, concealed, or manipulated material facts from Plaintiff and the Class regarding the defect(s), the actions taken to address the defect, and the end result of said actions;

c. Whether Defendant engaged in fraudulent, unfair or unlawful business practices with respect to the sale of the BMWs with the respective turbo system, turbochargers, high-pressure fuel pumps, and waste gate mechanisms;

d. Whether Defendant had a duty to disclose the defect(s) to the Plaintiff and Class;

e. Whether Defendant violated the California Consumer Legal Remedies Act;

f. Whether Defendant breached express warranties with Plaintiff and the Class;

g. Whether Defendant breached its duty of good faith and fair dealing;

h. Whether Plaintiff and the Class are entitled to damages; and,

i. Whether Plaintiff and the Class are entitled to equitable relief or other relief, and the nature of such relief.

76. <u>Typicality</u>: The Plaintiffs' claims are typical of the Class in that Plaintiffs and the Class all suffered damages as a direct proximate result of the same wrongful practices that the Defendant engaged in. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the Class members' claims. Plaintiffs' claims are based upon the same legal theories as the Class members' claims. The only difference between the Plaintiffs' and Class members' claims would lie in the amount of damages sustained, which could be determined readily and does not bar class certification.

77. <u>Adequacy</u>: Plaintiffs will fully and adequately protect the interests of the members of the Class and has retained class counsel who are experienced and qualified in prosecuting class actions, including consumer class actions and other forms of complex litigation. Neither the Plaintiffs nor his counsel have interests which are contrary to, or conflicting with, those interests of the Class.

78. <u>Superiority</u>: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, *inter alia*: it is economically impracticable for members of the Class to prosecute individual actions; prosecution as a class action will eliminate the possibility of repetitious and redundant litigation; and, a class action will enable claims to be handled in an orderly, expeditious manner.

## FIRST CAUSE OF ACTION

### (BREACH OF EXPRESS WARRANTY)

79. Plaintiff repeats and incorporates the allegations set forth above in paragraphs 1 through 40 above, as though set forth in full.

80. As set forth above, the written warranty provided to Plaintiff and the Class specifically identifies that, if their vehicle fails to operate in a safe and reliable manner, Defendant would make all necessary repairs to and/or replacement of any defective parts found, during the vehicle's warranty period. Additionally, defendant's advertising as referenced herein, warranted that the subject vehicles would perform to certain performance standards with respect to turbo lag, horse power, and torque and would be reliable and safe.

81. Plaintiffs and members of the Class submitted their Vehicles for warranty repairs to and/or replacement of a part due to the concerns described hereinabove and/or will submit their vehicles for repair under the defendant's recall campaign. Defendant failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair and/or replace the subject defective part under the vehicle's warranty as described herein and/or by altering the vehicles software so that it does not perform to its warranted performance standards.. With respect to class members who did not submit their car for repair, their refusal is justified since the defendant cannot and/or will not actually repair the subject vehicles as described herein. In fact, submitting a vehicle for repair under the defendant's recall campaign could potentially make the vehicle less safe.

82. The acts of Defendants, and each of them, in failing and/or refusing to repair and/or replace the vehicles during the warranty period so as to bring the vehicles into conformity with the express warranties, deprived Plaintiff and members of the Class of their rights

-21-

guaranteed them under the express warranties offered by Defendants.

83.     As a direct and proximate result of the willful failure of Defendants, and each of them, to comply with their obligations under the express warranties, Plaintiff and members of the Class have suffered actual and consequential damages.  Such damages include, but is not limited to, loss of the use and enjoyment of their subject vehicle, and a diminution in the value of the vehicle containing the defects identified herein.   The precise amount of these damages is unknown at the present time but is in excess of the jurisdictional limits of this Court.

<u>**SECOND CAUSE OF ACTION**</u>

**(VIOLATION OF CONSUMERS LEGAL REMEDIES ACT**

**UNDER CIVIL CODE §1750 et seq.)**

84.     Plaintiffs repeat and incorporates the allegations set forth above in paragraphs 1 through 46 above, as though set forth in full.

85.     The vehicles are "goods" as defined in Civil Code §1761(a), said vehicles having been purchased by Plaintiff primarily for personal, family, and household purposes.

86.     Plaintiff and the Class are "consumers" as defined in Civil Code §1761(d), since the subject vehicles were purchased primarily for personal, family, and household purposes.

87.     The purchase of the vehicles were a "transaction" as defined in California Civil Code §1761(e).

88.     The Consumer Legal Remedies Act ("CLRA"), codified as California Civil Code §1750 *et seq.*, prohibits the use of unfair or deceptive acts or practices in a transaction intended to result or which results in the sale or lease of goods to any consumer.  Among the acts prohibited is representing or warranting that the goods are of a particular standard, quality, or grade, if they are of another.  *See* California Civil Code §1770(a)(7).  The CLRA also prohibits advertising goods or services with intent not to sell them as advertised.   *See* California Civil Code §1770(a)(9).

89.     Plaintiffs are informed and believes, and thereon alleges, that the acts and practices described hereinabove, committed in California, were intended to result in the sale or lease of motor vehicles to the consuming public, including to Plaintiffs.  Defendant's acts and practices

-22-

violated, and continue to violate, the CLRA in at least the following respects:

    (a)    Representing that the vehicles identified hereinabove, have characteristics, uses or benefits they do not have, in violation of Civil Code §1770(a)(5);

    (b)    Representing that the vehicles are of a particular standard, quality or grade when they are of another, in violation of Civil Code §1770(a)(7); and

    (c)    Advertising good with the intent not to sell them as advertised, in violation of Civil Code §1770(a)(9).

90.    The misrepresentations and omissions outlined herein are material in that they relate to the overall safety and performance of the vehicles and consumers had a full expectation that the subject vehicles would not exhibit turbo lag, that the vehicles were safe, that they would retain their value at a rate exceeding that of competing vehicles, that they were reliable, and that they would meet or exceed their published performance characteristics. No consumer would have purchased the subject vehicles if they had been provided true and accurate information about the defects and/or would have paid substantially less for the vehicles at the time of purchase. At all times mentioned herein, the defendant had exclusive knowledge of the defects and actively concealed the defects from the public.

91.    Pursuant to California Civil Code §1780(a)(2), Plaintiff seeks an order enjoining Defendants from engaging in the unlawful, fraudulent and unfair business practices as alleged herein. This includes repairing the vehicles, such that the vehicles no longer constitute a safety hazard as described hereinabove.

92.    At all times mentioned herein, Plaintiff alleges that Defendant knew that the design of its engine was defective and posed an unreasonable safety risk to the public, due to the vehicle's sudden jerking forward and/or backward and the sudden loss of power while being driven at high rates of speed. With full knowledge of the facts identified herein, Defendant knowingly sold and continues to sell vehicles equipped with the defects to California residents, while concealing and suppressing the nature and scope of the defects. Such concealment and suppression was done to maximize its profits and its market share, and to avoid a costly recall and/or the cost of replacing the fuel pump on each of the affected vehicles.

93.     Pursuant to California Civil Code §1780(a)(2), Plaintiff seeks an order enjoining Defendants from engaging in the unlawful, fraudulent and unfair business practices as alleged herein.  This includes, but is not limited to, failing and/or refusing to cover repairs and/or replacement of the fuel pumps and/or waste gates for each of the affected vehicles as identified hereinabove.

94.     On or about May 25, 2010 and July 28, 2010, plaintiff sent demand letters to defendant on behalf of themselves and all other similarly situated individuals pursuant to Civil Code Section 1782.  In the demand letters, plaintiff demanded that the defendant remedy the above referenced conduct on behalf of the class within 30 days.  True and correct copies of the demand letters are attached hereto as Exhibits 13 and 14.  Thirty days has expired and defendant has refused to provide a remedy to plaintiffs or the class.  As such, plaintiffs seek damages on behalf of himself and the Class in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (UNFAIR BUSINESS PRACTICES UNDER BUSINESS & PROFESSIONS CODE §17200 *et seq*., AGAINST ALL DEFENDANTS)

95.     Plaintiffs repeat and incorporate the allegations set forth above in paragraphs 1 through 58 above, as though set forth in full.

96.     At all times mentioned herein, Plaintiffs alleges that Defendants knew that the design of its N54 engine was defective and posed an unreasonable safety risk to the public, due to the vehicle's sudden jerking forward and/or backward, the sudden loss of power while being driven at high rates of speed and/or the vehicle's malfunction indicator lights illuminating. Additionally, the defendant knew that its attempt to hide from the public the problems with its waste gates through the alteration of the vehicles software would significantly affect the vehicles performance and prevent consumers from discovering the defective nature of the vehicles.

97.     With full knowledge of the facts indentified herein, Defendants knowingly sold and continue to sell vehicles equipped with the defective fuel pump and waste gates to California residents, while concealing and suppressing the nature and scope of the defects.  Such concealment and suppression was done to maximize its profits and its market share, and to avoid

a costly recall and/or the cost of replacing the fuel pump on each of the affected vehicles.

98.     Additionally, defendants in their advertising and marketing materials, knowingly misrepresented the performance of the vehicles as well as the ability of the vehicles to avoid turbo lag.

99.     The business acts and practices of Defendants are unfair, unlawful, and deceptive within the meaning of Business & Professions Code §17200 *et seq*., in that such acts and practices are deceptive and substantially damaging to consumers and contrary to public policy. Consumers, including Plaintiff, who rely on the representations and warranties made, are injured when Defendants fail to honor the warranty as prescribed herein, and due to the safety concerns that exist in the subject vehicles.

100.     Moreover, Defendants' unlawful and unfair business practices present a continuing and ongoing threat to the public in that Defendants will continue to mislead and deceive the public regarding the quality and nature of the affected vehicles, and in that Defendants will continue to fail to honor and/or refuse to honor the terms of the express warranties provided to the consuming public.

101.     Under Business and Professions Code §17203, Plaintiff seeks an order enjoining Defendants from engaging in the unfair and unlawful practices and acts identified herein.  Said Code section also provides for equitable monetary relief so as to preclude the retention of all monies improperly obtained by Defendant as a result of such practices and acts.

102.     The acts and conduct alleged herein were willful, reckless, and done with malice such that an award of exemplary damages is warranted.

103.     Plaintiff further seeks attorney's fees and costs incurred as a result of bringing this action, under Code of Civil Procedure §1021.5.

## FOURTH CAUSE OF ACTION

### (BREACH OF THE IMPLIED COVENANT OF

### GOOD FAITH AND FAIR DEALING)

104.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

105.   In the course of purchasing and obtaining service for their respective BMWs, Plaintiff and Class members entered into agreements with BMW, and/or were otherwise in contractual privity.

106.   The agreements were subject to implied covenants of good faith and fair dealing, requiring that BMW conduct business with Plaintiff and the Class members in good faith and deal fairly and justly with them.

107.   BMW breached the implied covenants of good faith and fair dealing by selling Plaintiff and Class members BMWs that were equipped with defective turbo systems, turbochargers, high-pressure fuel pumps, and/or waste gate mechanisms, by abusing its discretion in the performance of the sales and service related contract(s), and by intentionally subjecting Plaintiff and the Class members to defects that were known and/or contemplated at the time of purchase.   BMW further breached the implied covenants of good faith and fair dealing by denying the existence of known, documented, reported defects and problems, installing ECU software to mask and hide defects and problems, in most cases without advising the consumer of the installation, and making efforts to avoid service, repair, and replacement obligations.

**FIFTH CAUSE OF ACTION**

**(VIOLATION OF THE MAGNUSON-MOSS ACT – EXPRESS WARRANTY)**

108.   Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

109.   The BMW vehicles and respective turbo systems, turbochargers, high-pressure fuel pumps, and waste gate mechanisms are "consumer products" as that term is defined by 15 U.S.C. §2301(1).

110.   Plaintiff and Class members are "consumers" as that term is defined by 15 U.S.C. §2301(3).

111.   BMW is a "supplier" as that term is defined by 15 U.S.C. §2301(4).

112.   BMW is a "warrantor" as that term is defined by 15 U.S.C. §2301(5).

113.   BMW provided Plaintiff and Class members with "written warranties" as that term is defined by 15 U.S.C. §2301(6).

-26-

114.    Section 15 U.S.C. §2310(d)(1) provides that a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this title, or a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief in any court of competent jurisdiction in any state or in an appropriate District Court of the United States.

115.    BMW breached its express warranties by selling BMW vehicles that had defective turbo systems, turbochargers, high-pressure fuel pumps, or waste gate mechanisms at the time of sale.

116.    BMW further breached its express warranties by refusing to replace the defective parts.

117.    In its capacity as supplier, warrantor, and service provider, and by the conduct described herein, any attempt by BMW to limit its express warranties in a manner that would exclude or limit coverage for the defective turbo systems, turbochargers, high-pressure fuel pumps, and waste gate mechanisms is unconscionable and any such effort to disclaim or limit liable for said defects is void.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant, and each of them jointly and severally, as follows:

1.    For compensatory damages in an amount to be determined at trial;

2.    For a civil penalty pursuant to Civil Code §1794, in an amount to be determined at trial;

3.    For restitution to Plaintiff of all funds unlawfully acquired by Defendant by means of any acts or practices declared by this Court to be in violation of Business and Professions Code §17200 *et seq*.;

4.    For an injunction to prohibit Defendant from engaging in the unfair business practices complained of herein, and for an injunction requiring Defendant to give notice to persons to whom restitution is owing of the means by which to file for restitution;

THIRD AMENDED COMPLAINT FOR DAMAGES

1         5.      For punitive damages in an amount to be determined at trial

2         6.      For reasonable attorney's fees;

3         7.      For costs and expenses incurred herein; and

4         8.      For such other and further relief as the Court may deem just and proper.

Dated: January 14, 2011.             KERSHAW, CUTTER & RATINOFF LLP

By: ___*/s/ Stuart C. Talley*_____
        STUART C. TALLEY
        Attorneys for Plaintiff

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 14, 2011.                    KERSHAW, CUTTER & RATINOFF LLP


By: ___*/s/ Stuart C. Talley*_____
        STUART C. TALLEY
        Attorneys for Plaintiff

-29-

1

**DECLARATION OF STUART C. TALLEY PURSUANT TO CIVIL CODE § 1780(c)**

2

I, STUART C. TALLEY, declare as follows:

3

    1.      I am an attorney at law duly licensed to practice before all courts of the State of

4

California, and am a partner in the firm of Kershaw, Cutter & Ratinoff, counsel of record for

5

Plaintiff.  I have personal knowledge of the matters set forth below and if called as a witness

6

could and would competently testify thereto.

7

    2.      I am informed and believe that venue is proper in this court under Civil Code §

8

1780(c) based on the following facts:

9

        (a)      Defendants have performed transactions at issue in this action, or have

10

obtained financial benefit from such transactions, at all times relevant to this action, in San

11

Francisco, California;

12

        (b)      At all relevant times herein, Plaintiff Nguyen resided in Milpitas,

13

California.

14

    I declare under penalty of perjury under the laws of the state of California that the

15

foregoing is true and correct and that this declaration was executed on January 14, 2011in

16

Sacramento, California.

17

18

                        */s/ Stuart C. Talley*
                        STUART C. TALLEY

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT FOR DAMAGES